IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

| | |
|---|---|
| GARY BULLWINKEL, | |
| | |
| Plaintiff, | |
| | |
| v. | No. 11-1082-JDB-egb |
| | |
| UNITED STATES DEPARTMENT OF | |
| ENERGY, et al., | |
| | |
| Defendants. | |
| | |

---

ORDER GRANTING
THE MOTION FOR SUMMARY JUDGMENT FILED BY THE TVA DEFENDANTS

---

Before the Court is the motion for summary judgment filed by Defendant Tennessee Valley Authority ("TVA") and its president, Thomas Kilgore (collectively, the "TVA Defendants"). (Docket Entry ("D.E.") 76.)  For the reasons stated herein, the motion is GRANTED.  Count 1 of the amended complaint is DISMISSED, Count 12 of the amended complaint is DISMISSED as to the TVA Defendants, and the TVA Defendants are terminated as parties to this action.

On April 8, 2011, the Plaintiff, Gary Bullwinkel, a resident of Somerville, Tennessee, filed a *pro se* complaint pursuant to, *inter alia*, the Administrative Procedure Act, 5 U.S.C. §§ 701-05; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq.* (D.E. 1.)  Plaintiff filed an amended complaint as of right on April 19, 2011.  (D.E. 5.)  On September 27, 2011, the

TVA Defendants filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, supported by a statement of undisputed facts, a legal memorandum, various documents, and the declarations of Jon M. Loney, Charles P. Nicholson and Billy W. Adams, Jr. (D.E. 76-81.) On October 18, 2011, Plaintiff submitted his pleadings, consisting of a response to the TVA Defendants' statement of material facts and a legal memorandum. (D.E. 85.) The TVA Defendants filed a reply on November 3, 2011. (D.E. 88.)

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321 (6th Cir. 2012). "In analyzing a motion for summary judgment, [courts are to] construe all evidence in the light most favorable to the non-moving party." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Dugle ex rel. Dugle v. Norfolk S. Ry. Co., 683 F.3d 263, 267 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 251-52, 106 S. Ct. 2505) (internal quotation marks omitted), reh'g & reh'g en banc denied (Aug. 2, 2012).

A party who does not have access to evidence necessary to respond to a summary judgment motion must file an affidavit under Federal Rule of Civil Procedure 56(d). See Abercrombie & Fitch

<u>Stores, Inc. v. Am. Eagle Outfitters, Inc.</u>, 280 F.3d 619, 627 (6th Cir. 2002).[1] Judicial review of NEPA decisions proceeds under the APA, <u>Friends of Tims Ford v. Tenn. Valley Auth.</u>, 585 F.3d 955, 964 (6th Cir. 2009); *see also* <u>Sierra Club v. Slater</u>, 120 F.3d 623, 630-31 (6th Cir. 1997) ("NEPA does not authorize a private right of action. . . . We have long recognized that federal courts have jurisdiction over NEPA challenges pursuant to the APA and so have many other courts[.]"), *reh'g & suggestion for reh'g en banc denied* (Oct. 15, 1997), and review of APA decisions is based on the administrative record, 5 U.S.C. § 706; <u>Slater</u>, 120 F.3d at 638. In this case, Plaintiff did not file a Rule 56(d) affidavit, and his motion to supplement the record (D.E. 151) was filed months after briefing on the instant motion was complete.[2] Therefore, the Court will address the merits of the TVA Defendants' motion.

In his amended complaint, Plaintiff sued the TVA because of its certification of an industrial megasite in Haywood County, Tennessee (the "West Tennessee Megasite" or "Megasite") in 2006.

---

[1]    <u>Abercrombie & Fitch</u> refers to subsection (f) of Rule 56. However, the Rule was amended in 2010 and subsection (f) was moved to subsection (d). *See* <u>Siggers v. Campbell</u>, 652 F.3d 681, 695 n.8 (6th Cir. 2011). According to the Advisory Committee's notes, "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments).

[2]    In their response to Plaintiff's motion to supplement the administrative record, the TVA Defendants represented that they provided Plaintiff with the additional information he sought, to the extent it existed. (D.E. 154 at 4.) That information was provided on October 27, 2011. (D.E. 154-2.) Plaintiff did not seek leave to supplement his response to the TVA Defendants' summary judgment motion upon receipt of that information.

(D.E. 5 ¶¶ 56-64.)[3]  Count 1 asserted a claim against the TVA under NEPA and the APA arising from its use of categorical exclusions in its megasite certification program in general and, specifically, on the West Tennessee Megasite.  (Id. ¶¶ 92-93.)  The prayer for relief asked the Court, inter alia, to

> 3.    Order Defendant TVA [to] cease its TVA Megasite Certification and Marketing program until a comprehensive NEPA process as required by [Council of Environmental Quality ("CQ")] regulations is conducted.
>
> 4.    Order Defendant TVA [to] withdraw the West Tennessee Megasite Certification and cease its marketing of the West Tennessee Megasite until the comprehensive NEPA process as required by USDA-RUS and CEQ regulations is conducted.

(Id. ¶¶ 3-4.)

Bullwinkel also sued the TVA because of its involvement in the Welcome Center and Solar Farm.[4]  TVA plans to purchase the power produced by the Solar Farm.  (Id. ¶¶ 16, 105, 107.)  Although the amended complaint is less than clear, Count 12 appeared to assert a claim against the TVA Defendants arising from their failure to identify and coordinate the Solar Farm and Welcome Center and its associated transmission lines as a connected action with the West Tennessee Megasite.  (Id. ¶¶ 139-41.)

The Supreme Court has summarized the operation of NEPA as follows:

> Signed into law on January 1, 1970, NEPA establishes a national policy to encourage productive and enjoyable

---

[3]    In the administrative record filed by the TVA Defendants, that site is sometimes referred to as the Haywood County Site or the Stanton Site.

[4]    That project has been described in previous orders.  (See D.E. 136 at 3-7; D.E. 137 at 4-7.)

harmony between man and his environment, and was intended to reduce or eliminate environmental damage and to promote the understanding of the ecological systems and natural resources important to the United States. NEPA itself does not mandate particular results in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions. At the heart of NEPA is a requirement that federal agencies

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on —
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

This detailed statement is called an Environmental Impact Statement (EIS). The [CEQ], established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement. The CEQ regulations allow an agency to prepare a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS. The EA is to be a concise public document that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS. If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a finding of no significant impact (FONSI), which briefly presents

the reasons why the proposed agency action will not have a significant impact on the human environment.

Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756-58, 124 S. Ct. 2204, 2209-10, 159 L. Ed. 2d 60 (2004) (internal citations, alterations & quotation marks omitted).

TVA is guided in its NEPA compliance by the regulations promulgated by the CEQ, 40 C.F.R. §§ 1500.1-1508.28 (2010), and by its own NEPA procedures ("TVA NEPA Procedures").[5]  With the approval of the CEQ, TVA enacted twenty-eight categorical exclusions for "[c]ategories of actions [that] do not normally have, either individually or cumulatively, a significant impact on the quality of the human environment and require neither the preparation of an EA nor an EIS." (TVA NEPA Procedures § 5.2, TVA AR 27; see also Decl. of Jon M. Loney dated Sept. 14, 2011 ("Loney Decl." ¶ 4, D.E. 77.)  The categorical exclusions include "[t]echnical and planning assistance to State and local organizations" (TVA NEPA Procedures § 5.2.2, TVA AR 27), "[p]rocurement activities" (id. § 5.2.4, TVA AR 27), and "[a]ny action which does not have a primary impact on the physical environment" (id. § 5.2.27, TVA AR 28).[6]  "By excluding from formal

---

[5]     A copy of TVA's Procedures for Compliance with NEPA has been submitted as an exhibit to the declaration of Bruce L. Yeager dated July 18, 2011. (D.E. 37-4.)  TVA's Procedures are at TVA AR 25-39. (D.E. 37-5.)

[6]     TVA's NEPA Procedures also provide that

[t]he office proposing to initiate an action shall determine, in consultation with the Environmental Quality Staff as appropriate, whether or not the proposed action is categorically excluded. An action which would normally qualify as a categorical exclusion shall not be so classified if: (1) the proposed action could have a potentially significant impact on a threatened or endangered
                                                        (continued...)

review actions which have no or only insignificant effects on the health of the environment, the use of categorical exclusions allows TVA to focus its attention and resources under NEPA on actions which arguably have a greater impact on the environment, and helps prevent unnecessary delays of TVA actions." (Loney Decl. ¶ 5.)

The following facts are pertinent to this motion:

1. Part of TVA's mission under the TVA Act of 1933, as amended, 16 U.S.C. §§ 831-831ee (2006 & Supp. III 2009), is to foster the development of the Valley Region.[7]

2. TVA works with local communities and governments to attract industry to encourage employment and economic growth. (*See* 16 U.S.C. §§ 831u, 831v (2006); Declaration of Billy L. Adams, Jr., dated Sept. 22, 2011 ("Adams Decl."), ¶ 2, D.E. 79.)

3. The megasite certification program was one of TVA's efforts to help local communities attract industry. (Adams Decl. ¶ 3.)[8]

---

[6]     (...continued)
species, wetland or floodplain, cultural or historical resource, important farmland, or other environmentally significant resource; or (2) substantial controversy over the significance of the environmental impacts associated with the proposed action has developed or is likely to develop.

(TVA NEPA Procedures § 5.2, TVA AR 27.)

[7]     Unless otherwise noted, Plaintiff has not disputed the proposed factual findings submitted by the TVA Defendants.

[8]     Plaintiff disputes this statement, although his point is unclear. Plaintiff cites a paragraph titled "Objective" in the contract between the TVA and its site-selection contractor to the effect that "[t]his, in turn, will increase the TVA region's competitiveness for future assembly plant locations." (Adams Decl., Ex. 1, D.E. 79-1 at 2.) Using that language, Plaintiff argues that the statement in the text is incomplete because "TVA's goals for its 'industrial certification program' exceeded just the local communities' interests in both geography and desire to provide a competitive edge over other development entities outside the TVA region." (D.E. 85 at 3.) The record citation on which Plaintiff relies does not appear to undercut the TVA Defendants' proposed finding that the megasite certification program was intended to help local communities attract industry. Plaintiff does not appear to contend that the TVA forced industrial development on communities over the objections of local governments.

7

4.   In March 2004, TVA, through its Economic
Development organization, entered into a contract with
McCallum Sweeney Consulting ("MSC"), a well-regarded site
selection consulting firm.   (Adams Decl. ¶ 3.)

5.   Under that contract, MSC, with the input of
TVA, was responsible for identifying and certifying so-
called industrial "megasites," sites which would have a
minimum of 700 contiguous and developable acres.   While
the program was originally focused on automotive plants,
eventually other non-automotive clients became interested
in, and eventually located on, the certified sites.
(Adams Decl. ¶¶ 3, 5.)[9]

6.   MSC was responsible for developing the criteria
for certifying megasites, reviewing the applications for
certification, and deciding which sites, if any, to
certify.   (Adams Decl. ¶ 3.)   TVA was responsible for
identifying cities that would receive initial [Requests
for Information ("RFIs")], using the criteria developed
by MSC.   (D.E. 79-1 at 3; D.E. 81 at 24.)[10]

---

[9]   The Court has revised the TVA Defendants' proposed factual findings
5 and 6 to reflect Plaintiff's objection that the TVA was responsible for
selecting communities that received RFIs using criteria developed by the TVA.
(*See* D.E. 79-1 at 3; D.E. 81 at 24.)

[10]   As previously noted, the Court has revised this proposed finding to
more accurately state TVA's role.   Plaintiff's other objections are not
persuasive and are not material for the reasons stated *infra*.   He is correct that
"[t]he TVA has defined mega sites as properties that contain at least 700
contiguous and developable acres." (D.E. 79-1 at 2.)   The documents reflect that
TVA hired MSC to certify sites that it believed would be most attractive to
companies seeking to open manufacturing facilities.   That TVA believed each such
site needed at least 700 contiguous acres does not alter that conclusion.   It
also does not appear that TVA was responsible for defining "the general site
information a certified site will have available." (D.E. 85 at 4.)   Plaintiff
has taken out of context a portion of one sentence in the "Objective" section of
the March 10, 2004 contract between TVA and MSC, which states as follows:

Certified sites receive a comprehensive review and have available
current site information such as water, sewer, electrical[,] gas,
and telecommunications availability and capacity, environmental
investigation, transportation accessibility and more.   In general,
certified sites are ready for constructions within six (6) months or
less after being chosen for development.   Most important,
certification will provide added certainty that a site will most
efficiently meet a particular project's development objectives.
This, in turn, will increase the TVA region's competitiveness for
future assembly plant locations.

(D.E. 79-1 at 2.)

(continued...)

8

9.   TVA's NEPA compliance staff reviewed the MSC contract for any issues under NEPA and discussed the contract with Economic Development staff.  (Loney Decl. ¶ 2.)

10.   Loney, the TVA Senior Manager for NEPA Policy at the time, reviewed the MSC contract and discussed it with his staff.  (Loney Decl. ¶ 6.)  He concluded that the contract was categorically excluded from NEPA review. (Id.)  The only product of the contract was a megasite certification with no guarantee that development would actually occur on any site, no commitment from TVA for any future action, and no impact on the physical environment due solely to the certification.  (Loney Decl. ¶¶ 3, 6.)[11]

11.   Based on the information obtained and their assessment of NEPA and TVA's implementing procedures, Mr. Loney concluded that formal NEPA review of the MSC contract — either an environmental assessment (EA) or an environmental impact statement (EIS) — was not required under TVA's NEPA procedures.  (Loney Decl. ¶ 6.)[12]

---

[10]   (...continued)
The Court has not adopted TVA's proposed findings 7 and 8 because those proposed factual findings are not material for the reasons stated *infra*.

[11]   The Court has revised this proposed finding to make clear that Loney made the decision on the categorical exclusions with input from his staff.  The Court also revised the second sentence of the proposed finding to eliminate the words "from MSC," because certified sites are listed on the TVA websites as TVA megasites.

Plaintiff's additional objections are not persuasive.  (*See* D.E. 85 at 6-7.)  That the megasites were to develop site layouts and cost estimates for marketing purposes and that TVA declared its intention to market the megasites are relevant only insofar as those activities took the contract outside the categorical exclusions on which Loney relied.  There is no dispute that it was hoped that the megasites would attract industry.  *See* Factual Findings ("FF") 1-3.)  The legal significance of that purpose will be addressed *infra*.

[12]   Plaintiff has objected on the basis, *inter alia*, that this proposed finding is conclusory.  (D.E. 85 at 7.)  The Court has adopted this proposed finding only to the extent that it reflects what Loney concluded.  Whether Loney's conclusion is legally correct will be addressed *infra*.  Plaintiff's objection that the "information obtained" by Loney has not been submitted will not be considered because Plaintiff has not provided a Rule 56(d) affidavit.  Contrary to Plaintiff's suggestion (*see, e.g.* D.E. 85 at 8), Fed. R. Civ. P. 56(e)(1) does not require a party to provide every document supporting the assertions in a factual affidavit.  The statements in Loney's affidavit are themselves evidence.

12. Loney concluded that the MSC contract was covered by several categorical exclusions — 5.2.2 (technical and planning assistance to State and local organizations); 5.2.4 (procurement activities); and 5.2.27 (any action which does not have a primary impact on the physical environment. (Loney Decl. ¶ 6.)[13]

13. Haywood County was one of approximately 25 applicants for megasite certification in 2004, proposing a site of approximately 1700 acres near Stanton, Tennessee. (Adams Decl. ¶¶ 8-10.)[14]

14. After an MSC review and critique, Haywood County revised and submitted the application in final form to MSC in February 2006. (Adams Decl. ¶ 9.)[15]

15. MSC certified Haywood County's Stanton site as an industrial megasite in early July 2006. (Adams Decl. ¶ 10.)[16]

16. Since the certification, TVA has assisted in marketing the Megasite by making information available about the Megasite on the TVA website which lists available industrial and commercial property in the Valley region, www.tvasites.com, and on a website which contains information on all the MSC-certified megasites, www.tvaed.com/megasites.htm. (Adams Decl. ¶¶ 11, 12.)[17]

---

[13]   The Court has revised this proposed finding to make clear that it represents Loney's conclusions. Plaintiff's objection (D.E. 85 at 8) appears to be legal in nature and will be addressed *infra*.

[14]   Plaintiff's evidentiary objection has been addressed *supra*. Moreover, as the TVA Defendants have pointed out, the documents Plaintiff seeks are irrelevant. The relevant issue in Count 1 is whether the MSC contract required an EA or an EIS, not whether the proposed West Tennessee Megasite met the criteria for certification developed by MSC in conjunction with TVA. (D.E. 88 at 8.)

[15]   Plaintiff's objection is not well taken for the reasons stated *supra*.

[16]   Plaintiff's objection is not well taken for the reasons stated *supra*. Plaintiff does not appear to dispute that the West Tennessee Megasite was certified in July 2006.

[17]   Plaintiff notes that Paragraph 12 of the Adams declaration states, in pertinent part, that "TVA has expended considerable resources and staff time on this marketing effort since the Megasite was certified in July 2006." (D.E. 85 at 9.) That statement supports the proposed factual finding.

Plaintiff's remaining objections are not well taken. His evidentiary objection has been addressed *supra*. Plaintiff also states that "[t]his disputed
(continued...)

17.   In the opinion of Mr. Loney and of Charles P. Nicholson, a TVA Manager for NEPA Compliance since 2009, these marketing efforts by themselves are not "major Federal actions" within the scope of NEPA because there is no impact on the physical environment.  (Loney Decl. ¶ 9; Declaration of Charles P. Nicholson, dated Sept. 20, 2011 ("Nicholson Decl."), ¶ 4, D.E. 78.)[18]

18.   The Megasite is currently undeveloped, and there are no specific plans for any future development. (Declaration of Ryan Gooch, dated July 18, 2011 ("Gooch Decl."), ¶ 9, at D.E. 46-1; Adams Decl. ¶ 13.)   The magnitude of potential developmental impacts [was] not known during the certification process.  Neither MSC nor TVA could predict the actual size, scope, or design of potential industrial operations until such time as this information was, or would be, revealed during an actual project.  (Adams Decl. ¶ 13.)[19]

19.   If TVA is proposed to be involved through funding or required approvals in any future development of the Megasite, such proposed action will be subject to the appropriate level of NEPA review.  (Nicholson Decl. ¶¶ 2, 5.)[20]

20.   Bullwinkel has known about the proposed Megasite since at least July 22, 2005, when he, his wife, and several other individuals filed suit in the Chancery Court of Fayette County, Tennessee, against Fayette and Haywood County officials under Tennessee law over their actions with respect to the Megasite application. (Compl. for Mandamus, *Gary Bullwinkel, et al. v. Rhea*

---

[17]      (...continued)
fact also does not assert that Bill Adams, as a TVA employee and specialist in industrial siting plays an active role in coordinated activities to market the megasites in contradiction to the fact that he does play an active role in these activities."  (Id.)  Plaintiff's point is unclear.  The first paragraph of the Adams declaration states that Adams has personally marketed the megasites.

[18]      The Court has revised this proposed finding to make clear that it reflects the conclusions of Loney and Nicholson.  Plaintiff's legal objections will be addressed *infra*.

[19]      Plaintiff's evidentiary objection was addressed *supra*.  His point about improper "segmentation" is a legal argument that will be addressed *infra*.

[20]      The Court notes that NEPA review may also be required based on the involvement of some other federal agency.  Plaintiff's claim that TVA's marketing activities require NEPA approval is a legal argument that will be addressed *infra*.

*Taylor, et al.*, No. 13973 (Fayette Cnty. Chancery Ct.), D.E. 76-3.)[21]

21.  In mid-July 2006, shortly after MSC announced that it had certified the Haywood County site as a megasite, Bullwinkel protested the certification to a member of the TVA Board of Directors and, within a few days, to a senior TVA manager.  (Loney Decl. ¶ 7.)[22]

22.  TVA will be purchasing the output of the West Tennessee Solar Farm for use on TVA's power system under one agreement and TVA will be helping support the Solar Farm's educational mission under a separate agreement. (Declaration of Jason K. Haile, dated July 13, 2011 ("Haile Decl."), ¶¶ 2-3, D.E. 37-2; Declaration of Alan Raymond, dated July 15, 2011 ("Raymond Decl."), ¶ 2, D.E. 37-3.)

23.  TVA is not involved in the construction of the Solar Farm and is not responsible for providing the interconnection facilities necessary to transmit the Solar Farm's output of electric power to the TVA transmission system.  (Haile Decl. ¶¶ 3-4)[23]

---

[21]    Plaintiff agrees that the fact is undisputed but questions whether it is material.  (D.E. 85 at 11.)  In an order issued on May 25, 2006, Plaintiff's suit was dismissed for want of standing.  (Order, *Gary Bullwinkel, et al. v. Rhea Taylor, et al.*, No. 13973 (Fayette Cnty. Chancery Ct.), D.E. 76-3 at 33-35.)  The court reasoned that "it is mere speculation that (1) the megasite will be approved by TVA and (2) that Haywood County will be successful in marketing the megasite.  Then and only then will the Plaintiffs' proximity to the megasite become an issue that might develop into a threat to their property."  (Id. at 3, D.E. 76-3 at 35.)

[22]    Plaintiff says he disputes this proposed finding "as to context and timing."  (D.E. 85 at 11.)  He states that he and other landowners appeared before the TVA Board of Directors in June 2006 (id. at 11-12), which would be consistent with the mid-2006 date in the proposed finding.  Plaintiff does not address the cited portion of Paragraph 7 of the Loney declaration, which states that "Gary Bullwinkel raised concerns about [the decision to certify the megasite] with me, a member of the TVA Board of Directors, and a senior TVA manager."

[23]    Plaintiff asserts that TVA, through its Purchase Power Agreement "and monopolistic control of local transmission substations, gave necessary agreement for the Solar Farm to proceed and fulfill its goal of providing power to the local grid."  (D.E. 85 at 12.)  He has not cited any record facts in support of his point.

24.   TVA's support for the educational program will not involve any ground-disturbing activities.  (Raymond Decl. ¶ 3.)[24]

25.   Due to TVA's involvement with the Solar Farm, TVA reviewed and adopted the Department of Energy's environmental assessment and issued its own finding of no significant impact, concluding that TVA's actions "will not have a significant impact on the quality of the environment."  (TVA AR 1, D.E. 37-5 at 1; *see also* D.E. 37-5 at 5.)[25]

26.   TVA's review of the DOE EA is documented at TVA AR 6-24, D.E. 37-5 at 6-24.

27.   The TVA staff discussed alternatives to the Solar Farm and assessments of impacts from the Solar Farm, noting the review process filed by the Department of Energy ("DOE") and DOE's mitigation action plan, adherence to which by the State of Tennessee was made a condition of TVA's FONSI.  (TVA AR 3-4, ECF No. 37-5 at 3-4.)[26]

28.   The TVA concluded:

TVA has independently reviewed the DOE EA, the underlying report and public comments, and has found the DOE document to be adequate and fully encompassing of the environmental effects and potential consequences of TVA's proposed actions. TVA is therefore adopting the 2011 DOE EA.  Based on the EA, TVA concludes that entering into the PPA, and providing funding for the educational component of the proposed visitor's center would not be major federal actions significantly affecting the environment.    Accordingly, preparation of an environmental impact statement is not required.

---

[24]    Plaintiff notes that the purpose of the Welcome Center is educational.  (D.E. 85 at 12.)  The amended complaint does not assert any claim based on TVA's commitment to fund educational programs at the Solar Farm and Welcome Center.

[25]    Plaintiff does not dispute that TVA took these actions, but he contends that TVA did not comply with NEPA and the APA.  (D.E. 85 at 13.)  The legal issues will be addressed *infra*.

[26]    Plaintiff's objections are not persuasive.  (*See* D.E. 85 at 13.)  The purpose of this factual finding is to state what TVA and its staff did.  The legal adequacy of those actions will be discussed *infra*.

(TVA AR 4-5.)[27]

29.  If the Solar Farm does not go into operation, five megawatts of solar generating capacity will not be available to the TVA system.  (*See* Declaration of David B. Dehart, dated July 14, 2011 ("Dehart Decl."), ¶ 3, D.E. 37-1.)  This would represent a substantial reduction in the projected solar generating capacity available to TVA from Tennessee sources.  (Dehart Decl. ¶¶ 2, 4.)[28]

30.  The Solar Farm is not in any way dependent on development of the Megasite, and will confer its expected benefits regardless of whether the Megasite is developed. (Gooch Decl. ¶ 9, D.E. 46-1; Declaration of Paula Flowers, dated July 18, 2011 ("Flowers Decl."), ¶ 14.)[29]

32.  The MSC Contract stated that "[t]he [TVA] is implementing an industrial site certification program for properties located within the TVA's service area."  (D.E. 79-1 at 2.)[30]

33.  The MSC contract stated that "[t]he TVA will catalogue and market the certified mega sites directly to automotive companies or to site selection firms which assist such companies in site and location assessments." (D.E. 79-1 at 2.)

34.  The MSC contract stated that, "[w]hen any payment is made under this contract, title to all material acquired and work performed under this contract,

---

[27]    Plaintiff's objection to this proposed finding as conclusory (D.E. 85 at 14) is not well taken because the purpose of the finding is to state what the TVA concluded.  The legal effect of that conclusion will be addressed *infra*.

[28]    Plaintiff disputes this proposed finding on the basis that the solar panels purchased by the University of Tennessee could be placed in other locations and could still provide power to the TVA grid under some circumstances. (D.E. 85 at 14.)  That objection appears to be legally irrelevant.

[29]    Plaintiff's objection (D.E. 85 at 14-15) appears to present a legal argument that will be addressed *infra*.  The land for the Solar Farm was not part of the Megasite.  (Flowers Decl. ¶ 16.)

The Court declines to adopt the TVA Defendants' proposed factual finding number 31, that "[n]o prospective development of the megasite is dependent on the construction of the Solar Farm."  (D.E. 76-1 at 5.)  As Plaintiff has pointed out (D.E. 85 at 15), development of the Megasite has not yet occurred and, therefore, it is not possible to know whether any eventual development will depend on construction of the Solar Farm.

[30]    The remaining factual findings are taken from Plaintiff's proposed undisputed facts.  (D.E. 85-1 at 5.)

shall vest in TVA, and title to all like property thereafter acquired or produced by Contractor and properly chargeable to the contract under generally accepted accounting principles shall vest in TVA. This provision is intended to vest in TVA full, absolute title and not merely a security interest." (D.E. 79-1 at 5.)

    34.   The MSC contract provided that

[t]he TVA shall be responsible for the following:

A.   Development and distribution of the solicitation documents for site submissions ("Site RFI") based upon [MSC's] data requirements for the site analysis process;
B.   Determination of which communities receive the Site RFI;
C.   Establishing deadlines to receive the Site RFI;
D.   Collection of site RFIs from communities. . . .
E.   Uniform packaging of Site RFIs upon receipt (for the Contractor's ease of use);
F.   Determination and implementation of marketing strategy to promote certified areas[.]

(D.E. 79-1 at 3.)[31]

    The TVA Defendants first argue that Plaintiff's claims about the megasite program and certification are moot. (D.E. 76-2 at 7-8.)   This argument challenges the Court's subject-matter jurisdiction over the first claim in the amended complaint.[32]

---

[31]   The Court has omitted Plaintiff's proposed factual finding 5 because it pertains only to certified sites in Columbus, Mississippi and Hopkinsville, Kentucky. (*See* D.E. 81 at 22.)   The Court has omitted Plaintiff's proposed factual finding 6 because it pertains only to Round II of the megasite certification program. (*See* id. at 86.)   Haywood County's Stanton site applied for megasite certification in 2004.   (FF 13; *see also* D.E. 81 at 23-24 (describing the additional work required before the Stanton Site can be certified).)

[32]   Ordinarily, a challenge to the Court's subject-matter jurisdiction is brought under Federal Rule of Civil Procedure 12(b)(1).

    A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction
                        (continued...)

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies[.]'" Hein v. Freedom from Religion Found., 551 U.S. 587, 597, 127 S. Ct. 2553, 2562, 168 L. Ed. 2d 424 (2007). This is "a cradle-to-grave requirement that must be met in order to file a claim in federal court and that must be met in order to keep it there." Fialka-Feldman v. Oakland Univ. Bd. of Trs., 639 F.3d 711, 713 (6th Cir. 2011). "[A] federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12, 113 S. Ct. 447, 449, 121 L. Ed. 2d 313 (1992) (internal quotation marks omitted); see also Coalition for Gov't Procurement v. Fed. Prison Indus., Inc., 365 F.3d 435, 458 (6th Cir. 2004) ("Under the 'case or controversy' requirement, we lack authority to issue a decision that does not affect the rights of the litigants."). The mootness question turns on whether a federal court can afford a litigant any "effectual relief." Coalition for Gov't Procurement, 365 F.3d at 458.

A NEPA claim is moot when the proposed action has been completed and no effective remedy is available. See Sierra Club v.

---

[32]   (...continued)
exists.

DLX, Inc. v. Ky., 381 F.3d 511, 516 (6th Cir. 2004), cert. denied, 544 U.S. 961, 125 S. Ct. 1733, 161 L. Ed. 2d 603 (2005). For reasons that are not clear, the TVA Defendants chose to bring their motion under Rule 56, which requires the Court to draw all reasonable inferences in favor of the non-moving party. See Gecewicz, 683 F.3d at 321.

16

United States Dep't of Agric. Rural Utils. Serv., No. 99-5515, 2000
WL 1679473, at *2-4 (6th Cir. Nov. 2, 2000) (per curiam); *see also*
City of Romulus v. Wayne Cnty., 634 F.2d 347, 348 (6th Cir. 1980)
(appeal of dissolution of injunction moot when challenged runway
completed).

To the extent Bullwinkel seeks to enjoin TVA's megasite
certification program, that claim is moot. TVA's contract with MSC
expired by its terms in 2006. (Adams Decl. ¶ 6.) He has
identified no ongoing effort to certify new megasites. There is,
therefore, no relief that can be afforded Plaintiff on this aspect
of his claim.

The record is insufficient to permit the Court to assess
whether Plaintiff's request that the TVA withdraw its certification
of the West Tennessee Megasite is moot. The TVA Defendants
emphasize that the certification decision was made by MSC and not
by TVA, and they note that neither MSC nor Haywood County is a
party to this action. (D.E. 76-2 at 8.) That argument is not
persuasive. MSC made its certification decisions on behalf of the
TVA, and it would appear that its decisions become the property of
TVA upon completion of the contract. (*See* FF 34.) There is no
evidence about the agreement between TVA and Haywood County, if
any, about marketing the Megasite, including the ability of Haywood
County to represent to manufacturers that the Megasite is TVA
certified.

To the extent Plaintiff seeks to enjoin TVA's marketing of
megasites that have already been certified, his claim is not moot.

The West Tennessee Megasite remains on the market, and the TVA's efforts to market that site are ongoing.  (*See* FF 16, 18; Adams Decl. ¶ 12.)  Should he prevail on the first claim of his amended complaint, the Court could enjoin the TVA Defendants from marketing the Megasite.

Therefore, this aspect of the TVA Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Count 1 is DISMISSED insofar as it seeks to enjoin the TVA's megasite certification program.

The TVA Defendants also argue that Plaintiff's claim for equitable relief against the TVA Megasite is barred by laches.  (D.E. 76-2 at 8 n.4.)

> Laches is the negligent and unintentional failure to protect one's rights. Laches consists of two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party. . . . As laches is an affirmative defense, the burden of establishing both of these elements is on the party raising the defense[.]

E.E.O.C. v. Watkins Motor Lines, Inc., 463 F.3d 436, 439 (6th Cir. 2006) (internal citations & quotation marks omitted), *reh'g & reh'g en banc denied* (Feb. 27, 2007).  The doctrine of laches is "strongly disfavored" in environmental suits.  Save the Peaks Coalition v. United States Forest Serv., 669 F.3d 1025, 1031 (9th Cir. 2012).

The TVA Defendants have not satisfied their burden of demonstrating that Count 1 of the amended complaint is barred by laches.  Although Plaintiff knew about the certification of the West Tennessee Megasite in 2006 (FF 20-21), more than five years

before he filed suit, the TVA Defendants have not established
prejudice.    The only prejudice cited is the effort the TVA
Defendants have made to market the Megasite since it was certified
in 2006.   (Adams Decl. ¶ 12.)   The sole specific example of that
marketing mentioned in the proposed factual findings is the
inclusion of the Megasite on two TVA websites.    (FF 16.)   Any
additional marketing activities referred to in Paragraph 12 of the
Adams declaration are not specified.   Moreover, the TVA Defendants'
laches argument is undercut by their assertion that Plaintiff's
claims about future development of the Megasite are not ripe.

The Court DENIES the TVA Defendants' motion for summary
judgment as to Count 1 on laches grounds.

Next, the TVA Defendants argue that Bullwinkel's claims about
future development of the West Tennessee Megasite are not ripe.
(D.E. 76-2 at 8-11.)   "The ripeness doctrine is drawn both from
Article III limitations on judicial power and from prudential
reasons for refusing to exercise jurisdiction[.]"   Nat'l Park
Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808, 123 S.
Ct. 2026, 2030, 155 L. Ed. 2d 1017 (2003) (internal quotation marks
omitted).   "[A] ripeness problem arises only if the claim involves
contingent future events that may not occur as anticipated, or
indeed may not occur at all."   Winnett v. Caterpillar, Inc., 609
F.3d 404, 413 (6th Cir. 2010) (internal quotation marks omitted).

> The ripeness doctrine prevents courts from entangling
> themselves in abstract disagreements through premature
> adjudication.   Courts consider three factors to evaluate
> ripeness:   (1) the likelihood that the harm alleged by
> the plaintiffs will ever come to pass; (2) whether the

> factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings.

Miller v. City of Cincinnati, 622 F.3d 524, 532 (6th Cir. 2010) (internal citations & quotation marks omitted), *cert. denied*, ___ U.S. ___, 131 S. Ct. 2875, 179 L. Ed. 2d 1188 (2011); *see also* Carey v. Wolnitzek, 614 F.3d 189, 196 (6th Cir. 2010) (same).

In this case, the TVA Defendants emphasize that no industrial development has occurred on the Megasite, and there are no plans for any such development.  (FF 18.)  Until there is a specific proposal, the magnitude of any environmental effects from industrial development of the Megasite cannot be assessed.  (Adams Decl. ¶ 13.)  In his response, Plaintiff states that he "has not sought to enjoin 'actual industrial development'" of the Megasite.  (D.E. 85 at 12.)  The prayer for relief in the amended complaint does not seek to enjoin future industrial development of the Megasite.  On the basis of that clarification, the TVA Defendants' motion for summary judgment on Count 1 on the basis of ripeness is DENIED.

Finally, the TVA Defendants argue that the TVA has fulfilled its obligations under NEPA for both the Megasite and the Solar Farm.  (D.E. 76-2 at 11-18.)  NEPA is essentially a procedural statute.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S. Ct. 1835, 1846, 104 L. Ed. 2d 351 (1989); Save Our Cumberland Mountains v. Kempthorne, 453 F.3d 334, 338 (6th Cir. 2006), *reh'g & reh'g en banc denied* (Dec. 6, 2006).  "If the

adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Robertson, 490 U.S. at 350, 109 S. Ct. at 1846.  Courts are required to give deference to an agency's determinations under NEPA:

> Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.  The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken.

Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S. Ct. 2718, 2730 n.21, 49 L. Ed. 2d 576 (1979) (internal citations & some quotation marks omitted); see also Marsh v Ore. Natural Res. Council, 490 U.S. 360, 377, 109 S. Ct. 1851, 1861, 104 L. Ed. 2d 377 (1989) (deference required for conclusions based on analysis of factual issues within area of agency's expertise).

"In general, agency decisions are set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Cmtys., Inc. v. Busey, 956 F.2d 619, 623 (6th Cir.) (citing 5 U.S.C. § 706(2)(A)), cert. denied, 506 U.S. 953, 113 S. Ct. 408, 121 L. Ed. 2d 332 (1992).  The "arbitrary or capricious" standard is widely applied in NEPA litigation.  See Marsh, 490 U.S. at 377, 109 S. Ct. at 1861 (applying arbitrary or capricious standard); Save Our Cumberland Mountains, 453 F.3d at 339 (applying arbitrary or capricious standard to agency's decision

not to prepare an EIS); <u>Burkholder v. Peters</u>, 58 F. App'x 94, 99 (6th Cir. 2003) (applying arbitrary and capricious standard to agency's decision to issue a FONSI); <u>Sherwood v. Tenn. Valley Auth.</u>, No. 3:12-CV-156, 2012 WL 2212971, at *2, 5 (E.D. Tenn. June 15, 2012) (applying arbitrary and capricious standard to agency's decision that action is covered by a categorical exclusion); <u>Buckeye Forest Council v. United States Forest Serv.</u>, 378 F. Supp. 2d 835, 849 (S.D. Ohio 2005) (same).   The scope of review is narrow:

> [I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one.  When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.

<u>Marsh</u>, 490 U.S. at 378, 109 S. Ct. at 1861 (internal citations & quotation marks omitted); *see also* <u>Davis ex rel. Farmers Bank & Capital Trust Co. v. Ky. Fin. Cos. Ret. Plan</u>, 887 F.2d 689, 693 (6th Cir. 1989) ("The arbitrary or capricious standard is the least demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."), *cert. denied*, 495 U.S. 905, 110 S. Ct. 1924, 109 L. Ed. 2d 288 (1990), *reh'g denied*, 496 U.S. 932, 110 S. Ct. 2634, 110 L. Ed. 2d 654 (June 11, 1990).

22

Count 1 of the amended complaint asserts a claim against the TVA under NEPA and the APA arising from its use of categorical exclusions in its megasite certification program in general and, specifically, on the Haywood County Megasite. (D.E. 5 ¶¶ 91-92.)[33] As previously noted, those decisions must be reviewed under the deferential arbitrary or capricious standard.

TVA Senior Manager for NEPA Policy Loney submitted a declaration detailing his conclusion, after consultation with his staff and with the TVA's Economic Development staff, that TVA's entry into a contract with MSC for selection of megasites fell within several categorical exclusions. (Loney Decl., D.E. 77.) He offered the following explanation for his decision:

> Based on my review of the MSC contract, and after discussions with my staff, I confirmed that the contract was categorically excluded from formal NEPA review. The purpose of the MSC contract was to provide technical and planning assistance to State and local organizations which were seeking help in attracting new industry. The contract was a TVA procurement activity, since TVA was procuring MSC's services under the contract. In addition, since certification by itself did not mean that a site would be subject to industrial development, only that it could be at some indeterminate point in the future, the contract did not have a primary impact on the physical environment. Accordingly, TVA categorical exclusions 5.2.2 (technical and planning assistance), 5.2.4 (procurement), and 5.2.27 (no primary impact on the physical environment) applied to the MSC contract. These categorical exclusions required no formal documentation under CEQ's regulations and TVA's procedures, nor did they require the opportunity for public input and comment.

(Id. ¶ 6.)

---

[33]    The Court has already dismissed Plaintiff's claim concerning TVA's megasite selection program as moot.

In his response, Bullwinkel suggests that Loney's analysis of the MSC contract was "belated" and a "past tense conclusory opinion." (D.E. 85-1 at 7.)  It is unclear whether he contends that Loney did not actually analyze the contract in 2004. Plaintiff did not contest FF 9.  Any claim that Loney did not evaluate the MSC contract in 2004 is belied by Paragraph 2 of the Loney declaration, which states that, in March 2004, Loney and his staff reviewed the contract and Loney discussed it with TVA's Economic Development staff.[34]  Paragraph 6 of the declaration states that Loney "confirmed that the contract was categorically excluded from NEPA review."  Loney also explained the absence of contemporaneous written documentation for his conclusions. (Loney Decl. ¶ 6.)

Plaintiff does not specifically take issue with Loney's analysis of the exclusions he concluded were applicable to the MSC contract.[35]  Instead, he questions whether Loney considered whether the exceptions to the categorical exclusions were applicable. (D.E. 85-1 at 8.)  Those exceptions apply if

---

[34]    *See also* Loney Decl. ¶ 5 ("While arguably Economic Development staff should have consulted with my staff about environmental review requirements before the [MSC] contract was executed, the contract had just been signed, no decisions under the contract had been made, and the contract could have been terminated at any time for any reason on 30 days notice.  Accordingly, I determined there was ample opportunity to correct any potential deficiencies relative to NEPA review.").

[35]    In his responses to the TVA Defendants' statement of undisputed facts, Plaintiff stated that the assertions were conclusory, the underlying information was not produced, and the contract should be analyzed as a "connected action." (D.E. 85 at 7-8.)  He also disputed whether § 5.2.27 had any application to the contract (D.E. 85 at 8), although his explanation why it does not is indecipherable.

> (1) the proposed action could have a potentially significant impact on a threatened or endangered species, wetland or floodplain, cultural or historical resource, important farmland, or other environmentally significant resource; or (2) substantial controversy over the significance of the environmental impacts associated with the proposed action has developed or is likely to develop.

(TVA NEPA Procedures § 5.2, TVA AR 27.)  Loney's declaration does not specifically state that he considered whether the exceptions might apply.  Even if Loney failed to consider those exceptions, Plaintiff has not established that the failure was an abuse of discretion.  As the TVA Defendants have pointed out, the MSC contract, in and of itself, had no effect on the physical environment.  (D.E. 88 at 8.)

Loney explained his decision that the certification and marketing of the West Tennessee Megasite did not require an EIS or an EA as follows:

> 7.   In July 2006, MSC certified as a megasite what is now known as the West Tennessee Megasite.  Gary Bullwinkel raised concerns about that decision with me, a member of the TVA Board of Directors, and a senior TVA manager.

> 8.   NEPA did not apply to the certification of the West Tennessee Megasite since MSC's decision did not result in any physical impacts.  If TVA was involved in the development of the Megasite at some time in the future, then NEPA could apply and some level of NEPA review could be required, along with other required environmental review and permitting processes.

> 9.   After MSC certified the Megasite and up to the time of my retirement in January 2008, TVA's Economic Development organization assisted in marketing the site.  Since this assistance did not involve any physical impacts, NEPA was not triggered and no NEPA review of any kind was required.

25

(Loney Decl. ¶¶ 7-9; *see also* Nicholson Decl. ¶¶ 3-5 (same); Adams Decl. ¶ 13 ("The magnitude of potential development impacts were not known during the certification process.  Neither MSC nor TVA can predict, the actual size, scope, or design of potential industrial operations until such time as this information is revealed during an actual project.  TVA has no control or responsibility for how the Megasite property is or might be developed in the future.").)  Dr. Nicholson explained that the possibility of NEPA review if, and when, a buyer is found for the West Tennessee site is very real:  "MSC certified a total of seven megasites under its contract with TVA.  Five of those sites have been sold.  Due to TVA involvement with the development of some of those five sites, TVA has conducted NEPA reviews of TVA's proposed actions, including three EAs on projects related to the three megasites in Mississippi." (Nicholson Decl. ¶ 7.)

Again, Plaintiff does not appear to dispute that the categorical exclusion in § 5.2.27 applies because the certification and marketing of the West Tennessee Megasite does not have a primary impact on the physical environment.  Instead, he cites the exceptions to the TVA's categorical exclusions.  (D.E. 85-1 at 8.) For the reasons previously stated, TVA did not abuse its discretion in failing explicitly to analyze the West Tennessee Megasite under § 5.2(1).  The certification and marketing of the Megasite did not, in themselves, effect the physical environment and, while Haywood County hoped that the certification would help in persuading a manufacturer to purchase the site, there was no assurance that such

an event would take place.  There also was no way to measure the
scope and type of effects that would occur, as they are dependent
on the type of manufacturer and the size of the planned facility.
(*See* Adams Decl. ¶ 13.)

Finally, Bullwinkel contends that the TVA improperly
"segmented" the Megasite project to avoid compliance with NEPA.
(D.E. 85-1 at 9.)

> From these [CEQ] regulations, courts have developed an
> "impermissible segmentation" rule.  Impermissible
> segmentation involves a "major federal action" where a
> small part of that action has been "segmented" in order
> to escape application of the NEPA process.  The hallmark
> of improper segmentation is the existence of two proposed
> actions where the proposed component action has little or
> no independent utility and its completion may force the
> larger or related project to go forward notwithstanding
> the environmental consequences.  Courts have also
> required that environmental effects of multiple projects
> be analyzed together when those projects will have a
> cumulative effect on a given region.  Finally, multiple
> stages of a development must be analyzed together when
> the dependency is such that it would be irrational, or at
> least unwise, to undertake the first phase if subsequent
> phases were not also undertaken.

Hirt v. Richardson, 127 F. Supp. 2d 833, 842 (W.D. Mich. 1999)
(internal citations & some quotation marks omitted); *see also*
Anglers of the Au Sable v. United States Forest Serv., 565 F. Supp.
2d 812, 831 (E.D. Mich. 2008) (same).  "The doctrine of improper
segmentation is limited, however, to proposed actions; NEPA does
not require an agency to consider the possible environmental
impacts of less imminent actions." Anglers of the Au Sable, 565 F.
Supp. 2d at 831 (internal quotation marks omitted); *see also* City
of Riverview v. Surface Transp. Bd., 398 F.3d 434, 442 (6th Cir.
2005) (same).

In Au Sable, for example, the court rejected an argument that the United States Forest Service, which had approved exploratory drilling for oil and gas, failed to consider the impact of other likely wells if the exploratory well were to be productive:

> This Court finds no improper segmentation because the future wells are not yet "imminent."  Indeed, the very point of an exploratory well is to evaluate the possibilities for future development; additional wells will not be proposed unless the first well is productive. Of course, if that eventuates, the cumulative effect of the present project, should it go forward, must be taken into account in assessing the new proposal.

565 F. Supp. 2d at 831-32.[36]

Similarly, in City of Riverview, the Sixth Circuit Court of Appeals held that the agency, which had approved a railroad's application to operate an intermodal transportation facility, was not required to consider that the railroad might at some point add river barge service at its terminal or purchase additional acreage and enlarge its facility.  City of Riverview, 398 F.3d at 442.  The appellate court explained that, "[w]ithout some details as to the amount of barge traffic contemplated or the nature of the pier or dock to be built, any environmental analysis would be based solely on conjecture."  Id.

Plaintiff has not shown that the TVA acted arbitrarily or capriciously or that it abused its discretion by improperly segmenting its analysis of the certification and marketing of the West Tennessee Megasite.  When the West Tennessee Megasite was

---

[36]    The Au Sable court found that the agency did fail to consider the precedential effect of allowing an exploratory well, id. at 832, a factor that is not present in the instant case.

certified in 2006, there was no proposal to purchase and develop the Megasite. Even today, the Megasite has not been developed and there are no plans for development. (FF 18.) Although Haywood County presumably sought certification of the Megasite in the hopes of attracting large-scale industrial development, NEPA does not require the TVA to perform a speculative environmental analysis of actions that are not imminent. Finally, Plaintiff does not suggest that, at the time the Megasite was certified, TVA had any knowledge that the Solar Farm and Welcome Center would be proposed for that area three years in the future.

For all the foregoing reasons, the Court GRANTS the TVA Defendants' motion for summary judgment on Count 1 of the amended complaint. The claim is DISMISSED.

The TVA Defendants have also moved for summary judgment on Plaintiff's claims against them in connection with the TVA's agreement to purchase power generated by the Solar Farm. (D.E. 76-2 at 11-18.) Although the amended complaint does not identify the parties sued on each claim, it appears that the TVA might be sued in Count 12, which alleges a violation of NEPA and the APA arising from a failure to identify and coordinate the Solar Farm and Welcome Center and its associated transmission lines as a connected action with the West Tennessee Megasite. (D.E. 5 ¶¶ 139-41.)[37] As previously noted, TVA reviewed and adopted DOE's EA and issued its own FONSI pertaining to the Solar Farm. (FF 25-28.) TVA's FONSI

---

[37] TVA is not named in Count 13, which alleges a violation of NEPA and the APA by the State of Tennessee arising from the Megasite. (D.E. 5 ¶¶ 142-43.)

was contingent on the State of Tennessee's adherence to a mitigation plan developed by DOE. (FF 27.)

In deciding to issue a FONSI, TVA did not simply rubber-stamp DOE's conclusions. TVA conducted an independent review of DOE's comprehensive EA (DOE AR 001207), as well as its "supporting documentation, underlying reports, agency consultation letters, findings, and public documents to verify the adequacy of DOE's assessment, and to ensure the bounding of potential impacts of TVA actions." (TVA AR 2, D.E. 37-5.) TVA's administrative record reflects that it considered additional documents and correspondence (TVA AR 6), allowed for its own notice and comment period (TVA AR 4), evaluated the alternative of taking no action (TVA AR 7), and conducted its own analysis of the impacts of the Solar Farm and Welcome Center project, including future approvals that would be required (TVA AR 3-4). Bullwinkel's objections to the TVA FONSI are not clearly stated, although, as previously noted, Count 12 of the amended complaint claims that the Solar Farm and Welcome Center should have been considered as a connected action to the Megasite.

Analysis of multiple projects as "connected actions with cumulative impacts" is required only for proposed actions pending concurrently before an agency. Lone Tree Council v. United States Army Corps. of Eng'rs, No. 06-12042-BC, 2007 WL 1520904, at *17 (E.D. Mich. May 24, 2007). TVA's analysis of the MSC contract occurred in 2004. In 2006, that contract terminated and the West Tennessee Megasite was certified. TVA's NEPA analysis of these actions took place before the Solar Farm was proposed and submitted

30

to the DOE for review in 2009.  (*See* DOE AR 1221; TVA AR 4.)  Thus, the Solar Farm and the Megasite were not pending concurrently.[38]

The Solar Farm and Megasite also do not satisfy the definition of "connected actions" in the pertinent CEQ regulation:

Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1).

In its NEPA review of the Solar Farm, TVA officials considered whether the project was connected to the Megasite.  The only evidence in the record are the conclusions of various TVA officials that the two projects are not connected.  According to Billy Adams, who is responsible for marketing the Megasite, "[p]rospective development of the Megasite is not dependent on the construction and operation of the Solar Farm." (Adams Decl. ¶ 14.)  TVA Manager for NEPA Compliance Nicholson has stated that "[t]he Solar Farm is independent of the Megasite.  The construction and operation of the Solar Farm will not compel development of the Megasite without the appropriate environmental review." (Nicholson Aff. ¶ 7.)  Plaintiff has not identified any evidence to the contrary.

---

[38]  Plaintiff's claim that TVA somehow acted improperly by failing to be the lead agency in analyzing the Solar Farm appears to be an attempt to qualify the Solar Farm and the Megasite as connected actions.  Even if the projects had been analyzed by the same agency, they still were not pending concurrently.  TVA's analysis of the Megasite was completed before the Solar Farm was submitted for review in 2009.

The administrative record indicates that DOE considered whether the Megasite was a connected action and concluded that it was not.   Thus, the DOE FONSI states as follows:

> Many of the comments received suggested that the West Tennessee Megasite is a connected action.  DOE determined the Megasite is not a connection action based on the definition in 40 CFR § 1508.  Neither the Megasite nor the Solar Farm would automatically trigger the other. Similarly, neither requires the other to be undertaken previously or simultaneously.  Finally, they are not interdependent parts of a larger action that depends on the larger action for their justification.  Although the plans for the Megasite are largely speculative based on the existing information, it was evaluated in the Cumulative Impacts section of the EA.

(DOE AR 001210; *see also* DOE AR 001212, 001343, 001344-45 (comment by Bullwinkel & responses), 001347-49 (comment by Bullwinkel & responses), 001358, 001363.)   Plaintiff has not demonstrated that the conclusion in the DOE EA that the Megasite and the Solar Farm are not connected actions is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.[39]

The Court GRANTS the TVA Defendants' motion for summary judgment on Count 12 of the amended complaint.   The claim is DISMISSED.

---

[39]      The DOE EA also attempted to analyze the cumulative impacts, which could not be precisely measured because there was no pending proposal for development of the Megasite.  (DOE AR 001210, 001225-26, 001227, 001231, 001271-75.)

Because it does not appear that the amended complaint asserts any other claims against the TVA Defendants, the Clerk is directed to terminate them as parties to this action.

IT IS SO ORDERED this 13th day of August 2012.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE