IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

| | | |
|---|---|---|
| GARY BULLWINKEL, | ◊ | |
| | ◊ | |
| Plaintiff, | ◊ | |
| | ◊ | |
| v. | ◊ | No. 11-1082 |
| | ◊ | |
| UNITED STATES DEPARTMENT OF | ◊ | |
| ENERGY, et al., | ◊ | |
| | ◊ | |
| Defendants. | ◊ | |
| | ◊ | |

---

ORDER GRANTING THE MOTIONS TO DISMISS FILED BY
THE STATE OF TENNESSEE, THE STATE OFFICIAL DEFENDANTS, AND
THE UNIVERSITY OF TENNESSEE DEFENDANTS
AND
ORDER OF PARTIAL DISMISSAL

---

Before the Court is the University of Tennessee Defendants' Motion to Dismiss Plaintiff's Title VI Claims (Docket Entry ("D.E.") 170) and the State of Tennessee's Motion to Dismiss and State Officials' Motion for Judgment on the Pleadings Regarding Title VI Claims. (D.E. 171). For the reasons that follow, these motions are GRANTED.

In previous orders, the Court dismissed the claims of Plaintiff, Gary Bullwinkel, arising under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-05, against the State of Tennessee, the State Official Defendants,[1] and

---

[1] The State Official Defendants are Tennessee Governor William Haslam; William Hagerty, Commissioner of the Tennessee Department of Economic and
(continued...)

the University of Tennessee Defendants.[2] (D.E. 116 (State of Tennessee), 117 (University of Tennessee), 120 (Dr. DiPietro), 130 (State Officials).) The only claims remaining against these parties arise under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* In an order issued on April 16, 2012, the Court granted the motions filed by the State of Tennessee and the University of Tennessee Defendants for a more definite statement of Bullwinkel's Title VI claims. (D.E. 142.) Plaintiff complied with that order by filing his More Definite Statement on Title VI Claims Against State Defendants ("More Definite Statement") on May 2, 2012. (D.E. 144.)

On September 4, 2012, the University of Tennessee Defendants filed their Motion to Dismiss Title VI Claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (D.E. 170.) Also on September 4, 2012, the State of Tennessee filed a similar motion to dismiss and the State Official Defendants filed a motion for judgment on the pleadings on those claims under Rule 12(c). (D.E. 171.) Plaintiff responded to these motions on September 18, 2012. (D.E. 183.)

The Title VI allegations in the Amended Complaint are as follows:

---

[1] (...continued)
Community Development ("TNECD"); and John Schroer, Commissioner of the Tennessee Department of Transportation ("TDOT").

[2] The University of Tennessee Defendants are the University of Tennessee and its President, Dr. Joe DiPietro.

48.  Plaintiff Gary Bullwinkel is an individual living at 5780 Yum Yum Rd, Somerville, TN 38068.[3]

52.  Mr. Bullwinkel is a member of the Greater Fredonia Community for Environmental Justice advocacy group and is concerned about the impacts of the Megasite and Solar Farm/Welcome Center/Transmission Lines on the residents of Fredonia, TN and other nearby minority communities where he has many friends.  He is very concerned with the disparate and discriminatory economic effects of the Megasite land option and purchase program in this area as executed by Haywood County and the State of Tennessee.  These land options were required by the Tennessee Valley Authority for continued certification status as a TVA Megasite.

61.  Haywood County, TN funded and executed option to buy legal instruments ("Megasite Options") on specified parcels during this time, and then in 2007 used State of Tennessee Funds to identify, select and contract for two year options to buy on specified parcels.  This enabled the West Tennessee Megasite to retain its TVA Megasite certification and qualify for the global marketing program funded by TVA for its certified Megasites.

64.  Representatives of the Sierra Club and Tennessee Clean Water Network are particularly concerned with the identification and avoidance of wetlands degradation; the displacement of thousands of acres of prime and unique farmland, and the depletion and pollution of groundwater resources and other possible adverse environmental effects of Megasite industrial development.  These groups, plaintiff and local citizens are also concerned about the Megasite effects of urban sprawl on rural communities.  They are especially concerned with the possible multiple detrimental and disparate effects of the West Tennessee Megasite on the adjoining minority community of Fredonia and other rural residents of air and water pollution.  Other adverse environmental effects would be traffic congestion, destruction of property values, and erosion of family integrity, religious and cultural mainstays of their current lifestyles.

65.  In 2007, the Tennessee Legislature allocated $3,000,000 to purchase 2 year options-to-purchase on multiple land parcels in the area for $500 an acre for the purpose of megasite development.  Franklin Smith,

---

[3]  This address is in Fayette County, Tennessee.

Mayor of Haywood County, TN negotiated and closed these options with particular landowners in the name of Haywood County but with the State of Tennessee funds. Of the 6,000 acres optioned only 70 acres belonging to a minority were optioned despite multiple minority owned properties immediately adjacent to and/or surrounded by parcels optioned to white landowners. These options were for two years and would expire worthless in Dec, 2009 if not exercised by Haywood County, TN for land purchases.

66. In May 2009, then TN Governor Phil Bredesen proposed to the Tennessee Legislature to purchase land parcels in the "Megasite" area using up to $40,000,000 of new bond funds for the West Tennessee Megasite site. The Legislature approved the purchase and Tennessee did exercise the previously executed "Megasite Options" and purchased over 3900 acres of specified numerically identified parcels for the West Tennessee Megasite in and around October, 2009.

68. September 15, 2009: DOE/NETL approved the application for TN Volunteer Solar Initiative ARRA funds. Tennessee announces the Solar Farm would be on Parcel "Site 40" previously optioned by the above 2007 "megasite option process". This parcel was located along Interstate 40 in Haywood County and was to be purchased by the University of Tennessee using unnamed funds. State authorities state the Solar Farm and Welcome Center would be "separated" from the West TN Megasite for the purposes of NEPA and the Environmental Assessment process would be only on the Solar Farm, Welcome Center and Transmission Lines.

70. September 22, 2009: The Fayette County Legislative body (County Commission) passes a resolution unanimously requesting the State of Tennessee respond to specific questions about the Megasite before purchasing land for the Megasite in the North Fayette County area. They also asked the State to investigate the complaints of discrimination concerning the land options, potential purchases and possible adverse environmental effects "Megasite" industrial development could bring to the area.

71. September 29, 2009: The State of Tennessee State Building Commission holds a public hearing during an Executive Committee meeting concerning the purchase of the Megasite properties. Property owners in Fredonia and Plaintiff testify at the hearing and deliver a Title VI complaint to these Constitutional Officers of Tennessee complaining of discriminatory actions and disparate

> effects from the land optioning process and any subsequent purchases made without consideration of their property values and resultant effects of industrial development on adjoining lands. The Title VI complaint document signed by 17 Fredonia property owners also complained of the possibility of subsequent subjection to environmental, transportational and cultural degradation of their living conditions after the planned industrial development.
>
> 72. September 29, 2009: The Tennessee State Building Commissions receives the Title VI complaint with accompanying testimony, prima facie documentation with maps from the official Haywood County Megasite application and then votes to allow the Tennessee Economic Development Commission to issue the bonds and purchase the designated properties at the price of $10,600 an acre (includes $500 option paid on most parcels). Parcels purchased included "Sites" 1, 2, 3, 5, 6, 9, 11, 13, 14, 15, 16, 17, 18, 19, 21, 20, 21 [sic], 22, 33, 34, 35, 36, 37, 42, 43, and 44.

(D.E. 5 ¶¶ 48, 52, 61, 64, 65, 66, 68, 70, 71, 72.) Thus, the Title VI factual allegations of the Amended Complaint are primarily focused on the purchases of land for the Megasite.

Count 5 of the Amended Complaint, titled "Violation of NEPA, NEPA regulations, for failing to properly limit actions during NEPA analysis and violations of APA Sec. 706(2)(c) for taking actions beyond statutory authority or limitations," may be the only claim asserted against the moving Defendants under Title VI. That claim includes the following Title VI allegations:

> 110. DOE/NETL not only allowed but gave approval to the State of Tennessee to use federally limited Stripper Well Agreement Funds to purchase the Solar Farm (Site 40 — Stuart Land) previously secured by the Title VI challenged State funded "Megasite Options" at the price of $500 per acre. The State of Tennessee subsequently divided the land into varied and reserved uses in violation of NEPA and the Stripper Well Agreement as dictated by a Kansas Federal District Court negotiated agreement.

> 113. NEPA, Environmental Justice, Title VI, DOE NEPA Regulations and original Kansas District Court settlement governing the use of Stripper Well PVE funds demand a close analysis of the socio-economic results on adjacent minority landowners of the precedent of commingling Federal PVE funds with the possibly discriminatory "Megasite Option" funds to purchase this piece of land. Defendants failed to perform and consider these required analyses in conjunction and timed with NEPA considerations concerning the land purchase and approval process to the detriment and harm of all parties involved.

(Id. ¶¶ 110, 113.) The Amended Complaint alleges that "DOE/NETL's approval, coordination and lack of coordination of these prejudicial and illegal actions" is contrary to NEPA and is "arbitrary, capricious, an abuse of discretion and exceeds statutory authority or limitations" in violation of the APA, 5 U.S.C. § 706(2)(A). (Id. ¶ 115.)[4] Claims 8 and 9, asserted against unspecified "Defendants," also allege that the NEPA analysis failed adequately to consider the impact on minority residents of potential adverse effects on drinking water and air quality. (Id. ¶¶ 124-32.)

In his More Definite Statement, Plaintiff stated that he "is asserting a freestanding Title VI claim against the moving defendants independent of the NEPA claims and also asserts that the Environmental Assessment published by the Department of Energy is deficient under NEPA for failure to consider Title VI implications

---

[4] Claim 3 asserts that the Federal Highway Administration ("FHWA") violated Title VI by failing to consider the Title VI complaint filed with the State of Tennessee arising from, inter alia, "the possible discriminatory and disparate economic effects of the megasite options and subsequent purchase of the Welcome Center on nearby black landowners." (D.E. 5 ¶ 103.) That claim does not appear to be asserted against the State of Tennessee, the State Official Defendants, or the University of Tennessee Defendants.

of the project covered by the assessment." (D.E. 144 at 1-2.)

Bullwinkel contends that the following acts violate Title VI:

> 1. The Governor of Tennessee and the Commissioner of TN ECD failed to perform and provide Title VI analysis for the State of Tennessee (coordinated by TN ECD) financing of Megasite land options executed through sub-recipient Haywood County in 2007. These binding options were executed to satisfy a vital requirement of the TVA Megasites Program Certification process. The TVA, the TN ECD Commissioner and the Haywood County Mayor coordinated a siting process to identify, groom and certify a site in Haywood County as "shovel ready" for a large industrial client, such as an auto assembly plant. This siting occurred in a rural area that was and is zoned for Forestry-Agricultural-Rural uses. These acts involve funding or approvals from TVA.
>
> 2. The Governor of Tennessee and the Commissioner of TN ECD failed to require Haywood County as a subrecipient of TVA monies/services to perform/provide Title VI analysis for the selection and administrative process of the Haywood County financing of Megasite land options in 2006 and the State of Tennessee refinancing of the Megasite land options in 2007. These binding options were executed to satisfy a vital requirement of the TVA Megasites Program Certification process. These acts involve funding or approvals from TVA.
>
> 3. The Governor of Tennessee and the State of Tennessee through the Tennessee State Building Commission ("SBC"), made up of the Constitutional officers of the State of Tennessee including the Governor, Lieutenant Governor, Speaker of the House, Treasurer, Comptroller and the Commissioner of Finance and Administration and the Commissioner of TN ECD failed to perform/provide Title VI analysis for the State of Tennessee exercise of the above Megasite Options and purchase of land for the "TVA certified" Megasite in the fall and early winter of 2009, including the Solar Farm plat. These land purchases were executed to satisfy a vital requirement of the TVA Megasites Program Certification process and to secure land parcels for an industrial siting process. These acts involve funding or approvals from TVA, DOE and FHWA.
>
> 4. The Governor of Tennessee and the State of Tennessee through the State Building Commission, the Commissioners of TN ECD and TDOT commissioned several engineering reports and specific infrastructure plans

(executed by SSOE and Long engineering firms) that detail extensive Megasite infrastructure projects including highway rerouting, Interstate access, wastewater and public water facilities, rail improvements, stream relocation, potential heavy industrial client facilities and the Solar Farm and transmission lines. The State of Tennessee through the SBC, the Governor of the State of Tennessee, and TN ECD and TDOT commissioners failed to perform/provide Title VI analysis on the effects of such siting and infrastructure development. These acts involve funding or approvals from TVA, DOE and FHWA.

     5.   The Governor of Tennessee, the Commissioners of TDOT and TN ECD failed to perform/provide Title VI analysis for the SR 222 rerouting, I-40 Exit Interchange upgrade, a proposed State Industrial Access (proposed Exit 44 on the Solar Farm), and proposed Welcome Center Development and effects on the surrounding communities, including plaintiff's, as required on State/FHWA State Transportation Improvement Program ("STIP") reporting process.

     6.   The Governor of Tennessee, the Commissioners of TDOT and TN ECD, the University of Tennessee ("UT") and the President of UT, Joe DiPietro, failed to perform/provide Title VI analysis for the Welcome Center land siting and/or planned acquisition of land as a part of a coordinated system of optioning and purchases for the West Tennessee Megasite and its developments and planned infrastructure including the planned State Industrial Access Interstate Exit partially located on the Solar Farm site. These acts involve funding or approvals from TVA, DOE and FHWA.

     7.   The Governor of Tennessee, the Commissioners of TDOT and TN ECD, the University of Tennessee ("UT") and the President of UT, Joe DiPietro, failed to perform/provide Title VI analysis for the use of restricted use Petroleum Violation Escrow Funds for acquisition of the Solar Farm land. As part of the Kansas District Court settlement, adequate restitution of these funds to lower income and minority petroleum users is required. The PVE funds are distributed and controlled by DOE.

     8.   The Governor of Tennessee, the Commissioners of TDOT and TN ECD, the University of Tennessee ("UT") and the President of UT, Joe DiPietro, failed to perform/provide Title VI analysis for the planned FHWA/TDOT Welcome Center wastewater and water supply effects.

>      9.    The Governor of Tennessee, the Commissioners of TDOT and TN ECD, the University of Tennessee ("UT") and the President of UT, Joe DiPietro, failed to perform/provide Title VI analysis for the planned closure of Albright Road and the destruction of the Albright Road Interstate Overpass. This is a project that would affect DOE and FHWA funding or approvals.
>
>      10.   The Governor of Tennessee, the Commissioners of TDOT and TN ECD, the University of Tennessee ("UT") and the President of UT, Joe DiPietro, failed to perform/provide Title VI analysis for the introduced effects of automobile and diesel truck air pollution, including dangerous ozone and particulate pollution, by the increased traffic and idling trucks common at Welcome Centers. This is a project that would affect DOE and FHWA funding or approvals.
>
>      11.   The Governor of Tennessee, the Commissioner of TN ECD, the University of Tennessee ("UT") and the President of UT, Joe DiPietro, failed to perform/provide Title VI analysis for the Solar Array Transmission line routing effects. This is a project that would affect DOE and TVA funding or approvals.

(Id. at 5-8.)  Thus, Paragraphs 1 through 3 appear to be stand-alone Title VI claims arising from the purchase of the land for the Megasite.  Every paragraph of the More Definite Statement also seems to assert a Title VI claim challenging various NEPA assessments as failing adequately to analyze the Title VI issues.[5]

The State of Tennessee and the State Official Defendants first contend that Bullwinkel, who is not a racial minority, lacks

---

[5] In its order granting the motions for a more definite statement, the Court instructed Plaintiff to "identify the paragraphs of the amended complaint that relate to the Title VI claims against the moving defendants" for any free-standing Title VI claim. (D.E. 142 at 2.) Although Plaintiff cited various provisions of the Amended Complaint in his More Definite Statement (D.E. 144 at 9-10), it is clear that most, if not all, of the issues presented in the More Definite Statement do not appear in the Amended Complaint. For purposes of this order, however, the Court will assume that the NEPA claims enumerated in the More Definite Statement were properly alleged in the Amended Complaint. Thus, with the possible exception discussed infra, this order addresses every Title VI claim Plaintiff purports to bring against the State of Tennessee, the State Official Defendants, and the University of Tennessee Defendants.

standing to sue under Title VI. (D.E. 171-1 at 2-6.) The University of Tennessee Defendants make the same argument. (D.E. 170-1 at 6-8.) These parties rely on the Court's order denying Plaintiff's motion for leave to file a second amended complaint, which held that he lacked standing to raise the Title VI claims in that proposed pleading. (D.E. 160 at 8-10.)

Motions to dismiss for lack of standing can arise under Rules 12(b)(1) or 12(b)(6) of the Federal Rule of Civil Procedure. Roberts v. Hamer, 655 F.3d 578, 580-81 (6th Cir. 2011), *reh'g & reh'g en banc denied* (Oct. 6, 2011). Where, as here, a challenge is made to a party's constitutional or prudential standing, the motion is properly brought under Rule 12(b)(1). *See, e.g.*, Stalley v. Methodist Healthcare, 517 F.3d 911, 916 (6th Cir. 2008), *cert. denied*, 555 U.S. 1137, 129 S. Ct. 1004, 173 L. Ed. 2d 294 (2009). "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." DLX, Inc. v. Ky., 381 F.3d 511, 516 (6th Cir. 2004), *cert. denied*, 544 U.S. 961, 125 S. Ct. 1733, 161 L. Ed. 2d 603 (2005). The instant motion is a facial challenge to the Court's subject-matter jurisdiction, so the Court will treat the allegations of Plaintiff's Amended Complaint and of his More Definite Statement as true.

"Standing to bring suit must be determined at the time the complaint is filed." Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs, 641 F.3d 197, 206 (6th Cir.), *cert. denied*, ___ U.S. ___, 132 S. Ct. 103, 181 L. Ed. 2d 31 (2011); *see also* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88, 104, 118 S. Ct. 1003, 1009, 1017, 140 L. Ed. 2d 210 (1998) (reviewing a dismissal for want of standing based on the pleadings). A plaintiff must satisfy both Article III and prudential standing. Smith, 641 F.3d at 206.

The requirements for Article III standing are as follows:

> The irreducible constitutional minimum of standing contains three requirements. First and foremost, there must be alleged (and ultimately proved) an "injury in fact" — a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical. Second, there must be causation — a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability — a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.

Steel Co., 523 U.S. at 102-04, 118 S. Ct. at 1016-17 (citations, footnote and some internal quotations marks omitted); *see also* Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992) (same).

In addition to Article III standing,

> [a] plaintiff must also meet the following prudential requirements for standing developed by the Supreme Court. First, a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. Second, a plaintiff must present a claim that is more than a generalized grievance. Finally, the complaint must fall within the zone of interests to be protected or

>     regulated by the statute or constitutional guarantee in
>     question.

Smith, 641 F.3d at 206 (internal quotation marks & citations omitted); see also Monroe Retail, Inc. v. RBS Citizens, N.A., 589 F.3d 274, 278 (6th Cir. 2009) (same), *reh'g & reh'g en banc denied* (Mar. 26, 2010).

In its order denying Plaintiff leave to file a second amended complaint, the Court explained why that pleading did not adequately allege prudential standing to litigate any Title VI claim:

>     Bullwinkel alleges in the proposed second amended
>     complaint that he lives, and owns property, in
>     Somerville, Tennessee, near the Solar Farm and the
>     Megasite. Plaintiff is an activist with an interest in
>     the productive use of farmland and in "smart growth." He
>     lives four miles from the Solar Farm and the Megasite and
>     often uses roads near those sites. The only allegations
>     about Plaintiff's standing to raise a Title VI claim are
>     the following:
>
>>     Mr. Bullwinkel is a member of the Greater Fredonia
>>     Community for Environmental Justice advocacy group
>>     and is concerned about the effects of the Megasite
>>     and Solar Farm on the residents of Fredonia, TN and
>>     other nearby minority communities where he has many
>>     friends. He is concerned with the disparate
>>     economic effects of the Megasite land option and
>>     purchase program in this area as executed by
>>     Haywood County and the State of Tennessee.
>
>     "Ordinarily, one may not claim standing . . . to
>     vindicate the constitutional rights of some third party."
>     Smith, 641 F.3d at 208. There is an exception to that
>     general rule where "the party asserting the right has a
>     close relationship with the person who possesses the
>     right, and . . . there is a hindrance to the possessor's
>     ability to protect his own interests." Id. (internal
>     quotation marks omitted). Even if it were assumed that
>     Plaintiff has a sufficiently close relationship with some
>     minority residents who live near the Megasite and Solar
>     Farm, there is no allegation that there exists any
>     hindrance to one or more such persons bringing their own
>     Title VI suit. *See* id. at 208-09 (holding that teachers
>     lacked prudential standing to assert the rights of their

>students and of the parents of those students as they could not meet the second prong of the test for third-party standing). Because the proposed Title VI claims could not withstand a Rule 12(b)(6) motion, it would be futile to allow Plaintiff to amend his complaint to assert those claims.

(D.E. 160 at 9-10 (record citations omitted).)

In his response, Bullwinkel does not appear to dispute that he lacks standing to bring a freestanding Title VI claim. (*See* D.E. 183 at 1-2, 3-4 (arguing that Plaintiff has standing to sue to require proper NEPA analysis), 5 ("Plaintiff only claims Title VI standing for himself concerning the procedural Title VI violations detailed in his First Amended Complaint and the More Definite Statement on Title VI.").) Therefore, those claims must be dismissed under Rule 12(b)(1).[6]

In his More Definite Statement, Plaintiff stated that, in addition to freestanding Title VI claims, he is also claiming that "the Environmental Assessment published by the Department of Energy is deficient under NEPA for failure to consider Title VI

---

[6] In his response, Plaintiff asserts, for the first time, that

>Plaintiff might have a specific Title VI Section 602 interest in the siting of the Solar Farm Transmission Lines by the University of Tennessee and Chickasaw Electric Cooperative ("CEC"). Three routes were shown in the DOE Environmental Assessment, AR 1236. Of the three, the route chosen was along land owned and populated mainly by white people including Plaintiff (who is white). The alternate routes went through a majority black neighborhood near Hwy 59 in Fayette County. No Title VI analysis was provided to show whether discrimination or disparate impacts was [sic] considered in this routing or whether Plaintiff might have been a victim of discrimination in the routing because he is white. This is of interest to Plaintiff.

(D.E. 183 at 4.) No such claim appears in the Amended Complaint or More Definite Statement. Even if that were not the case, it would be futile to allow Plaintiff to amend his complaint to assert such a claim for the reasons stated *infra*.

implications of the project covered by the assessment." (D.E. 144 at 1-2.) Plaintiff emphasizes that he has standing to sue on the ground that the various environmental analyses are deficient under NEPA for failing adequately to consider Title VI effects. He asserts that his injury

> is the lack of or the lack of access to Title VI analysis in a comprehensive industrial siting scheme promulgated by TVA, the State of Tennessee, DOE and FHWA, inter alia. Since these major Federal actions and fundings concerning this huge industrial siting are also subject to NEPA, the lack of any Title VI analysis in this case creates a procedural vacuum and therefore causes a critical flaw in the public process required by the NEPA law and by the Title VI law, Sections 601 and 602. Since the West TN Megasite and Solar Farm Project directly affect the plaintiff, this lack of Title VI analysis, in regards to the Federally funded activities regarding the siting itself AND in the NEPA process concerning the industrial siting, directly affects Plaintiff and the public interest, as well, through the detrimental effects of having bad or missing information and analysis on public decisionmaking.

(Id. at 3-4.)

This analysis is inadequate to provide Plaintiff with standing to litigate any portion of his NEPA claims, as one cannot base standing on a generalized interest that the law be properly executed. See, e.g., Hein v. Freedom from Religion Found., 551 U.S. 587, 599-600, 127 S. Ct. 2553, 2563, 168 L. Ed. 2d 424 (2007) (taxpayers lack standing to sue to ensure that public funds are spent in a constitutional manner); Lance v. Coffman, 549 U.S. 437, 441-42, 127 S. Ct. 1194, 1198, 167 L. Ed. 2d 29 (2007) (voters lack standing to challenge a redistricting plan); Lujan, 504 U.S. at 576-77, 112 S. Ct. at 2144-45 (rejecting standing to sue based on "the public interest in proper administration of the laws

(specifically, in agencies' observance of a particular, statutorily prescribed procedure)"). Instead, a plaintiff must allege some individualized injury. Sierra Club v. Morton, 405 U.S. 727, 735, 92 S. Ct. 1361, 1366, 31 L. Ed. 2d 636 (1972). Thus, the Amended Complaint alleged that Plaintiff owns land near the Megasite and Solar Farm and regularly spends time in and enjoys the natural features of the area. (D.E. 5 ¶¶ 48-49, 53-55.) Those allegations are sufficient for standing to raise most NEPA claims. *See, e.g.*, Summers v. Earth Island Inst., 555 U.S. 488, 494, 129 S. Ct. 1142, 1149, 173 L. Ed. 2d 1 (2009).

The parties had not addressed whether, by virtue of having general NEPA standing, Bullwinkel is entitled to challenge the Title VI analysis in the environmental assessments at issue. It is unnecessary to resolve this issue in connection with the motions to dismiss filed by the State of Tennessee, the State Official Defendants, and the University of Tennessee Defendants because the law is clear that Plaintiff's claims against those parties must be dismissed for the reasons stated *infra*. The Court DENIES the motion to dismiss for want of standing the claims challenging the adequacy of the analysis of the Title VI issues in the Environmental Assessment under NEPA.

Therefore, the Court GRANTS IN PART AND DENIES IN PART the motions to dismiss Plaintiff's Title VI claims for lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1).

Plaintiff's freestanding Title VI claims are DISMISSED WITHOUT PREJUDICE for want of standing.[7]

The State of Tennessee and the State Official Defendants also argue that Plaintiff's claims arising from the failure to undertake a Title VI analysis under applicable agency regulations arises under NEPA. (D.E. 171-1 at 7.) The Court has held that there is no private right of action under NEPA and the APA against the State of Tennessee and any state actor. This argument is well taken. Plaintiff's claims for failing to undertake the Title VI analysis required by NEPA and the APA are DISMISSED pursuant to Rule 12(b)(1) as to the State of Tennessee, the State Official Defendants, and the University of Tennessee Defendants.

The moving Defendants also argue that the Amended Complaint and More Definite Statement do not allege a viable claim under Title VI. (D.E. 170-1 at 3-6; D.E. 171-1 at 6-7.) This issue is presented under Rules 12(c) and 12(b)(6) of the Federal Rules of Civil Procedure. A motion for judgment on the pleadings under Rule 12(c) is analyzed using the standards applicable to Rule 12(b)(6) motions. Reilly v. Vadlamudi, 680 F.3d 617, 622 (6th Cir. 2012); Wee Care Child Ctr., Inc. v. Lumpkin, 680 F.3d 841, 846 (6th Cir.

---

[7] It is unnecessary to address the argument raised by the State Official Defendants about the availability of retrospective relief to remedy violations of Title VI arising from improper use of PVE funds to purchase property for the Solar Farm. (D.E. 171-1 at 7-7.) In previous orders, the Court dismissed Plaintiff's claims about improper use of PVE funds to make land purchases as barred by the Eleventh Amendment. (See D.E. 130 at 4 n.2, 5-6 ("The misuse of such [PVE] funds appears in Cause of Action 5 of the amended complaint, which arises under NEPA and the APA. Plaintiff's NEPA and APA claims against the State and the State Official Defendants were previously dismissed" as barred by the Eleventh Amendment).) Although the Eleventh Amendment bar does not extend to any Title VI claim arising from the use of PVE funds to purchase land, Bullwinkel lacks standing to litigate that claim.

16

2012), *reh'g denied* (May 25, 2012).  In assessing whether the complaint in this case states a claim on which relief may be granted, the Court applies the standards under Rule 12(b)(6) as stated in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  "Accepting all well-pleaded allegations in the complaint as true, the Court considers the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief." Williams v. Curtin, 631 F.3d 380, 383 (6th Cir. 2011) (internal quotation marks omitted); *see also* McGlone v. Bell, 681 F.3d 718, 728 (6th Cir. 2012) (applying same standard to Rule 12(c) motion).  "[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950; *see also* Twombly, 550 U.S. at 555 n.3, 127 S. Ct. at 1965 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.  Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.").

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance." Section 602, 42 U.S.C. § 2000d-1, provides in relevant part that "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract . . . , is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability . . . ."

Private individuals may sue to enforce § 601 of Title VI. Alexander v. Sandoval, 532 U.S. 275, 279, 121 S. Ct. 1511, 1516, 149 L. Ed. 2d 517 (2001). However, the law is clear that § 601 prohibits only intentional discrimination. Id. at 280-81, 121 S. Ct. at 1516 (collecting cases). Plaintiff's Amended Complaint, and his More Definite Statement, do not allege intentional discrimination. (*See, e.g.*, D.E. 5 ¶ 64 ("the possible multiple detrimental and disparate effects of the West Tennessee Megasite on the adjoining minority community").) Instead, Plaintiff's claims, which are based on the premise that various agencies failed adequately to consider the impact of environmental effects on minority communities when performing their NEPA analysis, are disparate-impact claims that are not actionable under § 601.[8]

"[R]egulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups,

---

[8] It is unclear whether the freestanding Title VI land-purchase claims are based on intentional discrimination or disparate impact. In either case, those claims have been dismissed for want of standing.

18

even though such activities are permissible under § 601." Sandoval, 532 U.S. at 281, 121 S. Ct. at 1517. The regulations cited in Plaintiff's More Definite Statement require agencies to evaluate possible disparate impacts of proposed projects. However, there is no private right of action to enforce compliance with regulations promulgated under § 602. Id. at 293, 121 S. Ct. at 1523.

In his response, Bullwinkel acknowledges the holding in Sandoval but argues that the decision, in effect, "giv[es] State applicants defacto [sic] immunity from a law that specifically denies them Eleventh Amendment immunity." (D.E. 183 at 10). Plaintiff is mistaken: States and State agencies, like any other party, can be sued under § 601 for intentional discrimination. No party can be sued on a disparate-impact theory under § 602.

Therefore, the Court GRANTS the motions to dismiss Plaintiff's claims against the State of Tennessee, the State Official Defendants, and the University of Tennessee Defendants under Title VI of the Civil Rights Act of 1964 and the regulations promulgated thereunder pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c). Those claims are DISMISSED WITH PREJUDICE.

Because all claims against the State of Tennessee, the State Official Defendants, and the University of Tennessee Defendants have been dismissed, the Clerk is directed to dismiss them as parties to this action.

IT IS SO ORDERED this 31st day of January 2013.

<u>s/ J. DANIEL BREEN</u>  
UNITED STATES DISTRICT JUDGE